HUGHES, J.
|TAt issue in this medical malpractice action is the extent to which the Louisiana Patient’s Compensation Fund (“PCF”) continues to be obligated to make advance payments for custodial/attendant care for a medical malpractice victim, after receiving information indicating that such care may no longer be needed, and whether the PCF had the right to unilaterally terminate such payments, without prior court approval, when a judgment was previously rendered ordering it to make said payments.
FACTS AND PROCEDURAL HISTORY
Dustin P. Watkins suffered an in útero stroke approximately two days before his December 20, 1990 birth, allegedly arising out of the medical malpractice of the treating obstetrician, Dr. Richard J. Barry, which resulted in a brain injury. This medical malpractice action followed, and a November 2003 trial resulted in damage awards, as follows: general damages to Dustin of $2 million; loss of future earnings to Dustin of $241,020.00; loss of consortium to Dustin’s mother, Tina Watkins, of $250,000.00; accrued medical and related custodial care expenses for Dustin, from December 24, 1990 through the date of judgment, in the amount of $437,193.08; and over $6 million for future medical care and related benefits | ¡.(including costs of custodial/attendant care for Dustin);[1] *947 along with judicial interest on the award of general and accrued damages from the date of filing with the Medical Review Panel until paid.[2]
The PCF appealed the decision, contesting: the district court’s subject matter jurisdiction to award particularized amounts of future medical care and related benefits; the award of accrued custodial/attendant care expenses; the interest awarded; and the amount of general damages. The appellate court affirmed the district court judgment. See Watkins v. Lake Charles Memorial Hospital, 2004-855 (La.App. 3 Cir. 12/15/04), 896 So.2d 130, writ denied, 2005-0145 (La.4/8/05), 898 So.2d 1279 (“Watkins I”).
Subsequently, a dispute arose between Ms. Watkins and the PCF over the payment of custodial/attendant care expenses (in addition to other matters not relevant herein), causing Ms. Watkins to file a rule in the district court to resolve the issues. Thereafter, the district court rendered judgment on December 23, 2005, which was signed on March 8, 2006, and, on the issue of custodial/attendant care, |sthe district court ruled:
i. plaintiffs were awarded attendant care in the original judgment;
ii. a claim for attendant care was made following all appellate delays;
iii. defendant failed to satisfy said claim within 30 days of submission;
iv. the Court hereby awards attendant care from date of judgment through June 30, 2005, in the amount of $52,920.00;
v. the Court hereby awards attendant care from July 1, 2005 through December 31, 2005, in the amount of $16,560.00; and
vi. the Court awards interest owed on such attendant care through December 31, 2005.
As to the payment of future medical benefits and related expenses, the district court further ordered the PCF to:
i. pay the amounts set forth in the original judgment on or before the dates specified for quarterly payments (i.e., January 15, April 15, July 15, October 15, etc.) with plaintiff providing certification of no change in the patient’s condition thirty (30) days prior to any quarterly payment period;
ii. deal appropriately with the health care providers by indicating, possibly by providing a letter of guarantee to all health care providers, or otherwise guaranteeing that the [PCF] shall have financial responsibility for payment within 30 days of any future medical benefits and re *948 lated expenses, as defined by the Act related to medical malpractice. The [PCF] may use any method reasonably appropriate to insure [sic] payment through the case manager with payment to be made within 30 days of submission of each expense;
*947 Respite Care (20/hrs./wk. @ $15.00/hr. x 5 yrs) $78,000.00
Custodial care, value of special services functioning as nurse/attendant, from $163,800.00 present until 2008 (when Dustin turns 18); 12/hrs/day x 7/days/wk. x 52/wks/yr. x $7.50 hr./ x 5 yrs.
Live-in support (24/hrs./day commencing @ age 18 @ $10.00/hr x 59 yrs.) $5,168,400.00
*948 iii. provide a prescription card to plaintiff for the acquisition of all prescription medication necessitated by the medical malpractice found herein. Thereafter, when the check did not arrive, plaintiff's counsel contacted the PCF and was told that the check must have been lost in the mail and that, once thirty days had passed, payment on the check could be stopped. In early September, 2011, the PCF indicated to plaintiff that no further custodial/attendant care payments would be forthcoming until the results of a requested independent medical examination ("IME”) of Dustin were received
The district court also amended the December 8, 2003 judgment to order that the PCF make all future payments for custodial/attendant care into the “Special Needs Trust for Dustin P. Watkins.” Additionally, the PCF was cast with the plaintiffs attorney fees, totaling $14,615.15, “for failing to satisfy attendant care claims within thirty (30) days of submission.”
|4The PCF appealed the decision, asserting that the trial court erred in: ordering it to pay future medical care expenses prior to the services being performed; in allowing the submission of a claim for reimbursement of future medical expenses without requiring proof that the services were actually performed; and in ordering it to pay custodial/attendant care expenses to a special needs trust, instead of to an actual service provider. The appellate court again affirmed the district court judgment. See Watkins v. Ban~y, 2006-858 (LaApp. 3 Cir. 12/6/06), 946 So.2d 262, twit denied, 2007-0373 (La.4/27/07), 955 So.2d 686 (“Watkins II ”).
Thereafter, in 2011, although the PCF advanced sums for custodial/attendant care through May of 2011, upon submission of Ms. Watkins’ affidavit certifying that there had been no change in Dustin’s disability or care requirements and seeking advance payment for custodial/attendant care for the upcoming quarterly payment due,[3] the PCF refused payment for these expenses. The refusal arose from the viewing, by a PCF representative, of information Dustin had apparently published on the Internet, on a social networking website, indicating that he was married, living with his wife, and no longer residing with his mother (who had previously provided custodial/attendant care for him). The PCF allegedly verified these facts and requested that Dustin undergo an independent neurological evaluation, contending that he was no longer actually receiving twenty-four hour custodial/attendant care. Meanwhile, in August of 2011, Ms. Watkins submitted an additional affidavit/certification to obtain advance payment for custodial/attendant care for the next quarterly payment due. Upon conclusion of the independent neurological evaluation by Dr. John Willis and receipt of the doctor’s report on September 27, 2011, the PCF continued to refuse payment of | scustodial/attendant care expenses. On the PCF’s refusal to pay for Dustin’s custodial/attendant care, Ms. Watkins submitted no further requests for payment and sought relief from the district court.[4]
*949 Between September 15, 2011 and March 13, 2012, Ms. Watkins filed three successive rules, which cumulatively requested the district court to: order the PCF to reinstate payment of Dustin’s custodial/attendant care expenses; order the PCF to pay for a neurological evaluation and independent living skills assessment performed on November 11, 2011 by Dr. Michael Chafetz; and award an increase in the hourly rate paid for custodial/attendant care from $10 per hour to $18 per hour. The district court conducted a hearing on these issues on March 26, 2012 and ruled that: Dustin was entitled to twenty-four hour custodial/attendant care from June 1, 2011 until March 26, 2012, amounting to a total of $72,000.00; the PCF was responsible for the $5,000.00 fee of Dr. Chafetz; Dustin would be entitled to six hours per day of custodial/attendant care, beginning on March 26, 2012; and the PCF was liable for the plaintiffs attorney fees and costs (which would be fixed by the court upon submission of an itemized statement, subject to traversal by the PCF). The district court’s written judgment was signed on August 15, 2012; the PCF appealed the judgment, which was affirmed. See Watkins v. Lake Charles Memorial Hospital, 2012-1320 (La.App. 3 Cir. 4/17/13), 114 So.3d 503 (“Watkins III”). On application of the PCF, this court granted certiorari. See Watkins v. Lake Charles Memorial Hospital, 2013-1137 (La.9/13/13), 120 So.3d 275.
|fiThe PCF asserts the lower courts erred in: (1) requiring the PCF to apply to the district court to obtain a judicial modification of the prior district court judgment, which had ordered the payment of custodial/attendant care costs, prior to discontinuing payment for this care, despite the PCF’s opinion that such payments were not medically necessary or actually incurred; (2) failing to limit the award of pre-hearing custodial/attendant care costs to the 2011 six-month time period for which the plaintiff had submitted affidavits to the PCF; and (3) awarding attorney fees and costs against the PCF when it allegedly had good reason for denying the prospective payment of twenty-four hour custodial/attendant care.[5]
DISCUSSION
The PCF contends that the district court’s ruling that the PCF had no authority to deny the payment of custodial/attendant care expenses requested by Ms. Watkins, without seeking a modification of the prior court order requiring the payment of these future medical expenses, divested the PCF of its “statutory right to process, review and either approve or deny claims as incurred.” The PCF asserts that there is no statutory requirement mandating that it obtain a judicial modification, particularly where, as in the instant case, it believes the claimant has not submitted truthful affidavits as to the malpractice victim’s medical condition. Furthermore, the PCF maintains that the pertinent law and jurisprudence only requires it to pay “actually incurred” medical expenses to a malpractice victim. Because the PCF had a “good reason” for denying the claims submitted, it also asserts that attorney fees and costs were improperly *950 awarded. In addition, the PCF contends that the plaintiff has failed to submit any affidavit regarding Dustin’s condition since August of 2011, and, therefore, it owes no payment for custodial/attendant care after that time.
|7The plaintiff counters that the PCF arbitrarily terminated payment for Dustin’s custodial/attendant care as of June 2011, without medical justification (an IME was not obtained until September 2011), but rather allegedly on the basis of Face-book posts, which were not introduced into evidence. The plaintiff asserts that Dustin continues to suffer from cognitive and emotional deficits, as a result of the malpractice that caused his brain injury, which require ongoing supervision.
The issues presented in this case require this court to determine whether the lower courts properly interpreted provisions of the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. (“MMA”), governing the future medical care and related benefits, set forth in LSA-R.S. 40:1299.43, and whether the evidence presented supported the facts found by the district court as warranting the awards entered against the PCF. We review the questions of law de novo, without deference to the legal conclusions of the tribunals below; however, the factual findings of the trial court will not be upset unless they are manifestly erroneous or clearly wrong. See Wooley v. Luclcsinger, 2009-0571 (La.4/1/11), 61 So.3d 507, 553-54.

Medical Malpractice Act

The legislature enacted the MMA in 1975 to ensure the availability of affordable medical services to the public, by: reducing or stabilizing medical malpractice insurance rates, limiting potentially significant liability exposure of health care providers, and establishing a framework for compensating individuals injured as a result of medical malpractice committed by qualified health care providers. The MMA limits the liability of a single qualified health care provider to $100,000.00 for a medical malpractice victim’s injury or death, and any damages in excess of $100,000.00 may be recovered from the PCF; damages may not exceed $500,000.00. See Williamson v. Hospital Service District No. 1 of Jefferson, 2004-0451 (La.12/1/04), 888 So.2d 782, 785-86; Hall v. Brookshire Brothers, Ltd., 2002-2404 (La.6/27/03), 848 So.2d 559, 565; Bijou v. Alton \xOchsner Medical Foundation, 95-3074 (La.9/5/96), 679 So.2d 893, 896 (citing Russo v. Vasquez, 648 So.2d 879, 881-83 (La.1995)). The MMA, which substantially impedes the ability of tort victims to obtain a full recovery of damages, is in derogation of established rights and is to be strictly construed. See Hanks v. Seale, 2004-1485 (La.6/17/05), 904 So.2d 662, 669; Hall v. Brookshire Brothers, Ltd., 848 So.2d at 568.
Extension of MMA coverage to future medical care and related benefits, in addition to the prior limits of liability, was accomplished by 1984 La. Acts, No. 435, § 3, which added LSA-R.S. 40:1299.43. See Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210, 1214; Williams v. Kushner, 549 So.2d 294, 297 (La.1989). The purpose of LSA-R.S. 40:1299.43 is to grant severely injured malpractice victims, who have been deprived by the liability cap of compensation for any necessary medical service, a speedy, convenient, and inexpensive administrative remedy for the payment of actually incurred medical expenses, without limit, except as tailored to the patient’s needs. The legislation enacting LSA-R.S. 40:1299.43 aims to remedy to an extent the damage cap’s harsh tendency to prune recovery inversely to the injury, and to provide cost-effective, actuarially- *951 sound methods for financing and delivering compensation for medical services necessitated by medical malpractice. See Hall v. Brookshire Brothers, Ltd., 848 So.2d at 575; Kelty v. Brumfield, 633 So.2d at 1216-17.
Pursuant to LSA-R.S. 40:1299.43(A), the factfinder in a malpractice action is charged with determining whether the patient is or is not in need of future medical care and related benefits and the amount thereof. Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits, as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the PCF for all future medical care and related benefits directly or indirectly made necessary by the health care provider’s [ 9malpractice. See LSA-R.S. 40:1299.43(C). Payments for medical care and related benefits are made by the PCF without regard to the five hundred thousand dollar limitation imposed in LSA-R.S. 40:1299.42. See LSA-R.S. 40:1299.43(D). “Custodial services” are considered to be “future medical care and related benefits.” See LSA-R.S. 40:1299.43(B)(l)(b) and La. Admin Code, Title 37, Part III, § 1903 (defining “future medical and related benefits” as including “reasonable ... custodial services ... ”). See also La. Admin Code, Title 37, Part III, § 1917 (providing for “nursing” and/or “sitter” care).
A future medical care award is not a lump sum award payable immediately to a plaintiff, but rather will be paid out by the PCF, pursuant to the provisions of LSA-R.S. 40:1299.43, as expenses are incurred. See Hanks v. Seale, 2004-1485 (La.6/17/05), 904 So.2d 662, 673 (citing Hall v. Brookshire Brothers, Ltd., 848 So.2d at 576). A plaintiff should make a claim to the PCF for payment of medical care and related benefits. See Bijou v. Alton Ochsner Medical Foundation, 679 So.2d at 898. Notwithstanding, the district court from which the final judgment has issued retains continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient. See LSA-R.S. 40:1299.43(E)(1). If the court finds that the PCF has unreasonably failed to pay for medical care within thirty days after submission of a claim for payment of such benefits, the court must award reasonable attorney fees to the claimant’s attorney. See LSA-R.S. 40:1299.43(E)(2).
In the instant case, the procedures established by LSA-R.S. 40:1299.43 were followed by the lower courts. On December 8, 2003 the district court signed a judgment ruling that Dustin Watkins was in need of future custodial/attendant care pursuant to LSA-R.S. 40:1299.43(A). In affirming the district court’s award, the appellate court noted: “Although contained in the judgment, these expenses are not made executory until review and approval by the [PCF] or, if denied, upon | ^subsequent order of the court under its continuing jurisdiction.” Watkins I, 896 So.2d at 135 (citing LSA-R.S. 40:1299.43(E)(1)).
Thereafter, as authorized by LSA-R.S. 40:1299.43(C), Ms. Watkins sought payment of these expenses from the PCF, but was denied, and the matter was presented to the district court for resolution. The district court then ruled, pursuant to its continuing jurisdiction under LSA-R.S. 40:1299.43(E)(1), that the PCF was unreasonable in failing to timely pay for the custodial/attendant care sought, since these expenses were previously awarded by the court and Dustin’s condition had not changed. Under the circumstances, the district court deemed it necessary to order the PCF to make prospective quarterly payments for custodial/attendant *952 care, to be paid following the submission of the plaintiffs affidavit certifying no change had occurred in Dustin’s condition. In his oral reasons for judgment, the district court stated that since the court had previously determined custodial/attendant care was necessary, there was nothing left for the PCF to do other than to make the payments, absent “some abuse of the custodial care.” The court indicated that if the PCF felt there was some abuse, “there are mechanisms that would allow [the PCF to] bring that forward.” The district court judgment was affirmed on appeal. See Watkins II, 946 So.2d 262.
The PCF concluded, in May of 2011, that some abuse had occurred in relation to Ms. Watkins’ application for the payment of custodial/attendant care expenses, when it discovered that Ms. Watkins no longer lived with Dustin, as the PCF assumed that Ms. Watkins could not possibly be providing twenty-four hour custodial/attendant care to Dustin under the circumstances. Despite the PCF’s concerns, it initiated no proceeding in the district court to obtain relief from the prior 2006 judgment compelling it to pay these expenses in advance to the plaintiff. The district court’s oral reasons for judgment, issued in connection with that 2006 judgment, indicated that should the PCF suspect abuse in relation to the | T1 payment of custodial/attendant care expenses, the PCF would bring the matter before the district court for resolution, stating:
... the Court has determined that that [custodial care] is basically 365 days a year ... and has set a specific rate with regard to that.
... “[I]ncurred” means to become liable or subject to as a result of one’s action. There is no liability until the actual treatment has occurred. But, ... with regard to custodial care we know that that is going to occur regardless of whether there is a transport, an illness issue, or any other questions that the custodial care will be in existence.
So, at this point I am going to order that the [PCF] make quarterly payments starting January 15th of 2006, the next payment April 15th of 2006, the next July 15th of 2006, and the next October 15th 2006. That will occur each year as long as custodial payments are due on those quarterly amounts prepaying the three months of custodial payments that would be owed to the special needs trust.... Those amounts will be received. The trust will make the appropriate disbursements. Those amounts will be incurred regardless of what happens with the specifics of future medical care.
[[Image here]]
... [T]here are mechanisms that would allow, if they felt there to be some abuse of the custodial care, that the [PCF] could bring that forward, but ... there is not a requirement as to who is going to have to provide it. It has been determined it is needed. It has been determined a value. It has been affirmed by the [Appellate] Court. I don’t see that there would be anything other than the payment of those funds that is necessary, and ... doing it on a quarterly basis ... whatever the concerns could be, there is not any significant detriment to either the [PCF] or I feel to the trust in obtaining that custodial care by dealing with it in that fashion, that way knowing that the funds would be available and on account, and yet not be deemed as a resource to the detriment of the child because of the special needs trust ruling.
[[Image here]]
... [T]he attendant care I find is not something that the child has to participate. It is an absolute. It is distinct *953 from the future medical needs as being incurred by specific healthcare providers, and for that reason I’m ordering that it be ... basically paid in advance to allow the case manager and the trust the ability to deal with it as need be.
[[Image here]]
... But let’s say that 30 days after the prepayment something happened to the child.' Then, basically the 60 days would be reimbursed back to the [PCF]. That would be the obligation of the plaintiff. I mean, [the PCF has] legal rights all the way. But, basically [the PCF] do[es not] have total control, and that is the problem that the [PCF] seems to have is wanting to have absolute control over every dollar that comes out of this, and I think that is where some of the problems have arisen.
| ^Furthermore, the district court’s subsequent July 11, 2012 written reasons, issued in connection with the August 15, 2012 judgment now under review, support the conclusion that the court contemplated the PCF would present any desired modification of the 2006 judgment to the district court for adjudication, stating:
The PCF willfully violated the mandate of the 2006 judgment by making the unilateral determination to cease the custodial care payments, despite receiving certification from [the plaintiff] that there had been no change in Dustin’s condition.
... [T]he fact that a misrepresentation or change in condition has occurred or is suspected does not allow the PCF to make the unilateral determination to cease payment.
[[Image here]]
... [P]rior to discontinuing payments for future medical care and related benefits, ie. custodial care, it must first obtain a judicial ruling modifying the prior judgment.
The PCF has no legal right to substitute its own opinion for the ruling of this Court.
The PCF asserts that the district court’s ruling requiring judicial modification directly conflicts with this court’s decisions in Hanks v. Seale, Hall v. Brookshire Brothers, Ltd., and Kelty v. Brumfield, as well as with the appellate decision in Bar-tee v. Children’s Clinic of Southwest Louisiana, 2005-583 (La.App. 3 Cir. 8/17/05), 910 So.2d 470, writ denied, 2005-2465 (La.3/24/06), 925 So.2d 1230.
However, none of the cited cases dealt with the issue presented herein (i.e., whether the pre-existence of a trial court judgment, ordering the continuing, prospective, and quarterly payment of custodial/attendant care expenses, following the PCF’s initial denial of payment, mandated the PCF to continue paying custodial/attendant care unless judicial modification of the prior judgment was obtained).[6] Al *954 though the issues currently presented in the instant case were not at | isissue in the cases relied on by the PCF, the cited cases noted that future medical costs and related benefits are paid by the PCF when incurred, pursuant to LSA-R.S. 40:1299.48. See Bartee v. Children’s Clinic of Southwest Louisiana, 910 So.2d at 472-74; Hanks v. Seale, 904 So.2d at 673; Hall v. Brookshire Brothers, 848 So.2d at 576; Kelty v. Brumfield, 638 So.2d at 1216-18. Based on this statement of law and the authority granted to the PCF in this regard by LSA-R.S. 40:1299.43(0, the PCF contends: “Nowhere in the MMA is the PCF required to make unconditional future medical payments that are neither necessary nor rendered without first obtaining a judicial ruling modifying the pri- or judgment.”
First and foremost, the PCF’s argument ignores the significance of the district court’s 2006 judgment ordering the PCF to pay quarterly and in advance for Dustin’s custodial/attendant care. Court orders must be obeyed until set aside. See Dauphine v. Carenero High School, 2002-2005 (La.4/21/03), 843 So.2d 1096, 1106-07; City of Lake Charles v. Bell, 347 So.2d 494, 496-97 (La.1977).[7] |14Failure to comply *955 with a court order is a constructive contempt of court. See LSA-C.C.P. art. 224 (“Any of the following acts constitutes a constructive contempt of court: ... [w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court ... ”). Further, if a judgment orders a defendant to do or refrain from doing an act and he refuses or neglects to comply with the order, the party entitled to performance may obtain by contradictory motion the following remedies: (1) A writ to distrain the property of the defendant; (2) An order adjudging the disobedient party in contempt; or (3) A judgment for any damages he may have sustained. The party entitled to performance may also sue for damages. See LSA-C.C.P. art. 2502. See also LSA-C.C.P. art. 2503 and 2504.[8]
| ^Furthermore, requiring the PCF to comply with the district court’s rulings, judgments, or orders until modified or set aside does not conflict with the provisions of the MMA. Our review of the MMA reveals that the only provisions directly addressing the decision-making aspects of the presentation, for payment by the PCF, of specific items of future medical care or related benefits are found in LSA-R.S. 40:1299.43(0 (providing in pertinent part: “Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits ... and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the [PCF] ... for all future medical care and related benefits directly or indirectly made necessary by the health care provider’s malpractice ...”) and LSA-R.S. 40:1299.43(E) (providing that the district court, from which final judgment issues, “shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient” and “shall award reasonable attorney fees to the claimant’s attorney if the court finds that the [PCF] unreasonably fails to pay for medical care within thirty days after submission of a claim for payment of such benefits”). Thus, the decision-making structure established by LSA-R.S. 40:1299.43 for determining whether to pay claims for future medical care and related *956 benefits is as follows: (1) the district court issues a judgment decreeing the plaintiff/patient is in need of future medical care and/or related benefits; (2) the plaintiff/patient submits an initial claim for payment of future medical care or related benefits to the PCF; and (3) if denied, the district court may be asked to determine whether the denial was [ ^reasonable under its continuing jurisdiction. The MMA contains no restriction on a district court’s judicial power to fashion a remedy to ensure that specific recurring future medical care and related benefit expenses are timely paid by the PCF, as was done in the instant case.
We conclude that it is implicit in the grant of continuing jurisdiction to the district court by LSA-R.S. 40:1299.43(E) that, once a district court exercises its continuing jurisdiction, the PCF is obliged to comply with the district court’s rulings, orders, or judgments until such time as the district court modifies or recalls same.[9] Despite the PCF’s attempt to expand the initial decision-making authority granted to it under LSA-R.S. 40:1299.43(0, citing Kelty v. Brumfield and subsequent jurisprudence, these cases did not involve compliance issues related to rulings, orders, or judgments subsequently issued by a district court in the exercise of its continuing jurisdiction; therefore, this jurisprudence provides no guidance in the instant case. Accordingly, we affirm the district court ruling that the PCF was required to seek modification of the court’s March 8, 2006 judgment, ordering the quarterly, advance payment of custodial/attendant care, prior to discontinuing these payments.

Pre-Hearing Award of Custodial!Attendant Care Costs

The PCF also contends that because, prior to the March 26, 2012 district court hearing, the plaintiff had submitted only two affidavits for payment (seeking the payment of custodial/attendant care costs for two quarters in 2011), and none subsequently, the district court should not have awarded the payment of any custodial/attendant care beyond those two quarters. Further, the PCF claims that the plaintiff failed to establish that twenty-four hour care had actually been |17provided through the hearing date.
We find no merit in the former argument, as the submission by the plaintiff of an affidavit to the PCF was a procedure put in place by the district court as a means of procuring advance payment of these expenses and in no way affected the power of the district court to adjudicate whether payment was owed by the PCF for either prior or subsequent such expenses. Additionally, the plaintiffs September 19, 2011 rule placed both past and future custodial/attendant care expenses before the district court by specifically requesting that the court compel the PCF to pay “accrued” custodial/attendant care expenses, as well as “continuing” quarterly care expenses. Further, the PCF’s arguments overlook the fact that, on the date of the district court hearing on these issues, a stipulation was entered on the record by the parties, which narrowed the issues before the court.[10]
*957 During the March 26, 2012 hearing, the following colloquy took place between the district court and counsel regarding the stipulation agreed upon by the parties: THE COURT:
... It’s my understanding you said there was a stipulation to put of record ....
[PLAINTIFF’S COUNSEL]:
Yes, Your Honor. I believe we’ve agreed to make any change in custodial care payments prospective from this point on....
[[Image here]]
[DEFENSE COUNSEL]:
... [M]y understanding is that we waived any procedural requirement to ask the Court, the PCF to ask the Court, to amend its prior judgment, that the plaintiffs have agreed to allow us to move forward on a prospective basis asking that this Court reconsider the need and/or the amount of time required to provide custodial care to Dustin Watkins.
THE COURT:
| lsFrom the ... original final judgment?
[DEFENSE COUNSEL]:
That’s correct, Your Honor.
THE COURT:
And do you anticipate filing any additional pleadings in conjunction with the prospective application?
[PLAINTIFF’S COUNSEL]:
From the standpoint from our side, Your Honor, we feel like we’ve been adequately apprised of the fact that that’s an issue today by virtue of the memorandum which raised it, and we will waive the requirement that they file such a pleading and proceed as though it had been filed if that will accommodate. THE COURT:
As if it had been filed as of today for [a] prospective basis?
[DEFENSE COUNSEL]:
That’s correct, Your Honor.
THE COURT:
All right. Then let the record so reflect.
Not only did the PCF fail to file any pleading with the district court to seek relief from the previous judgment,[11] which mandated the prospective payment by the PCF of the plaintiffs custodial/attendant care costs, despite insinuating that the plaintiff had submitted fraudulent affidavits,[12] at no time during the entry of this in-court stipulation did the PCF urge any reservation of right to contest the validity of the custodial/attendant care costs that had accrued prior to the date of the hearing.
A stipulation has the effect of a judicial admission or confession,[13] which binds all parties and the court. Stipulations between the parties in a specific case are binding on the trial court when not in derogation of law. Such agreements are 119the law of the case. Becht v. Morgan *958 Building & Spas, Inc., 2002-2047 (La.4/23/03), 843 So.2d 1109, 1112, cert, denied, 540 U.S. 878, 124 S.Ct. 289, 157 L.Ed.2d 142 (2003) (quoting R.J. D’Hemec-ourt Petroleum, Inc. v. McNamara, 444 So.2d 600 (La.1983)). See also Winford v. Conerly Corporation, 2004-1278 (La.3/11/05), 897 So.2d 560, 566.
Accordingly, we conclude that, since the parties stipulated that any change in custodial/attendant care payments owed to the plaintiff would be prospective, applicable from the date of hearing and thereafter, the district court did not err in awarding custodial/attendant care expenses that had accrued prior to the date of hearing pursuant to the court’s prior 2006 judgment.

Attorney Fees and Costs Award

The PCF further asserts the district court erred in taxing it with attorney fees and costs, contending it had denied the payment of custodial/attendant care for good cause.
The MMA, in LSA-R.S. 40:1299.43(E)(2), requires a district court to award reasonable attorney fees to the claimant’s attorney “if the court finds that the [PCF] unreasonably fails to pay for medical care within thirty days after submission of a claim for payment of such benefits.” In this case, the district court judge held the PCF liable, under LSA-R.S. 40:1299.43(E)(2), for the plaintiffs attorney fees after determining that the PCF “willfully violated the mandate of the 2006 judgment.” As indicated herein-above, we agree with the district court that the PCF was obligated to comply with the terms of the 2006 judgment unless modified or set aside by the district court.
Notwithstanding, the record presented in this case also reveals that the PCF was unreasonable is discontinuing the advance payment of custodial/attendant care expenses, based on the facts available to them at the time, as found by the district court in its written reasons for judgment:
12pAfter careful consideration of the two independent medical evaluations, as well as all expert witness testimony, the PCF has not met its burden of proving that the custodial care being rendered to Dustin is inadequate or inappropriate and not in the best interest of Dustin.
[Ms. Watkins] has been the provider of custodial care to Dustin since he was born, and considering the challenges faced due to Dustin’s mental impairments and anger management issues, she has been successful. [Ms. Watkins] provides structure and supportive care to Dustin, which helps to prevent him from harming himself or others. She understands and is familiar with the problems and needs associated with Dustin’s conditions. It is apparent that through [Ms. Watkins’] past efforts, Dustin has maximized his independence to date. At some point that may be at 100 percent, but that level has not yet been achieved. Currently, the care that [Ms. Watkins] provides is adequate, appropriate and in the best interest of Dustin.
This Court takes note of the fact that [Ms. Watkins] must remain available to Dustin at all hours of the day. It is also noted that [Ms. Watkins] has attempted independent employment, but she had to leave that position to be available to address issues with Dustin. However, [Ms. Watkins] testified that she provides between five and six hours of care per day to Dustin on an average day. Accordingly, it is ordered that [the] previous custodial care award for twenty-four hours per day for 365 days per year is reduced to six hours per day for 365 days per year.
*959 The evidence presented to the district court supported these factual findings and conclusions. Ms. Watkins testified that, although she no longer lives with Dustin, he continues to need her assistance with anger and emotional issues, financial matters (including paying his bills, managing his checking account, and preparing Social Security disability and food stamp documents), keeping up with his medication, keeping on-hand necessary groceries, and cleaning and maintaining his residence. Ms. Watkins testified that she makes herself available to respond to Dustin’s needs any time he calls. Ms. Watkins also testified to past incidents of physical aggression displayed by Dustin when he experiences an anger or rage event, during which he has, variously, texted her forty times in a day, punched walls, peeled out in his car, punched the car windshield, punched himself in the head, hit and kicked his pets, pushed his brother and her down, broken glass in the house, damaged his camper, and threatened to Mil himself. After a rage event, Ms. 121 Watkins stated that Dustin cries and apologizes. She also stated that she has learned calming techniques from Dustin’s counselor, which she uses when Dustin gets angry to avoid escalation of an event; she is also teaching these techniques to Dustin’s wife, Sarah.
In addition, the depositions of both Dustin and Sarah were introduced into evidence. Both Dustin and Sarah confirmed the testimony of Ms. Watkins that Dustin has problems managing his anger, that he initiates fights with others when he does not get his way, and that he, at times, hits and damages things in and around his house, car, and camper. Sarah testified that Dustin has previously pulled her hair, held her down, bitten her, and punched her; she stated that he is always sorry afterward. Sarah, who was pregnant at the time, also stated that she is worried how Dustin will manage his emotions when their child is born. Dustin testified that when he needs someone to help him calm down that he prefers to call his mother for assistance. Dustin also stated that his mother takes care of his finances because he is not good with math, and he indicated that he is unable to do some of the chores around the house without assistance.
Michael D. Chafetz, Ph.D., a clinical neuropsychologist, who employed over twenty diagnostic tests in his examination of Dustin, testified that, as a result of his neo-natal stroke and subsequent seizure disorder, Dustin had abnormal cognitive development, resulting in low intellectual functioning (he has a full-scale IQ score of 69), impaired neuropsychological status, poor calculation abilities, poor language abilities, poor verbal and visual memory abilities, reduced attention and concentration, reduced visuomotor and fine motor abilities, and a pronounced cognitive disorder, particularly in executive functioning (which Dr. Chafetz indicated was an individual’s ability to self-regulate his behavior). Dr. Chafetz stated that although Dustin can take care of most of his daily needs, he is unable to manage financial affairs and is unable to make complicated medical decisions. ^According to Dr. Chafetz, Dustin has difficulty keeping track of medication, making medical appointments, and in taking care of some household cleaning and maintenance tasks. Dr. Chafetz testified that Dustin cannot control his anger or hurt feelings, cannot keep secrets or confidences, and cannot stay away from situations that are harmful to him. Dr. Chafetz stated that Dustin remains impulsive, inattentive, and lacks insight and judgment; he also has behavioral problems that include bullying, defiance, lying, physical aggression, and anger and rage outbursts. Notably, Dr. Chafetz emphasized the importance of the support *960 and supervision provided by Dustin’s mother, and he indicated that, without someone to help him, Dustin would probably “end up homeless” or in jail as a result of “[gjoing off on somebody.” With regard to employment, Dr. Chafetz opined that Dustin would have difficulty entering the workforce without assistance, and he would need supervision to retain employment, given his anger management issues and difficulty understanding directions.
Dr. Charles Murphy, Dustin’s treating psychiatrist, and Scott Riviere, Dustin’s counselor, both confirmed the opinions of Dr. Chafetz, that Dustin has cognitive deficits as a result of his neo-natal stroke, which affect his emotional stability and cognitive functioning. Both Dr. Murphy and Mr. Riviere also agreed that Dustin needs supportive supervision to manage his impairments.
In addition, rehabilitation counsellor Glenn Hebert evaluated Dustin and visited in Dustin’s home. Mr. Hebert testified that he viewed evidence of Dustin’s behavioral problems around his home, as he saw physical damage to the home, which included holes in the walls. Mr. Hebert also concluded that Dustin would be unlikely to maintain employment, citing his poor impulse control, inability to stay on task, inability to get along with people, argumentative nature, and tendency to threaten physical violence when angry.
DaThe PCF presented the medical testimony of Dr. John K. Willis, an expert in neurology, who testified that he examined Dustin in September of 2011 and issued the September 27, 2011 IME report relied upon the PCF in terminating Dustin’s custodial/attendant care benefits. He noted that Dustin had suffered, at the time of his birth, a left middle cerebellar infarct, with middle right hemiparesis and subsequent seizures. He also stated that Dustin was thought to have had ADHD, a behavioral disorder, and some developmental delays during childhood as a result of the stroke. Dr. Willis stated that he was asked by the PCF to determine whether Dustin continued to have neurological damage. His examination revealed that Dustin had recovered all of his motor abilities and had a normal neurological examination. Dr. Willis testified that Dustin was not intellectually gifted (indicating that his academic and intellectual progress was below normal), that he had some behavioral problems, including anger management issues, and that he reported undergoing counseling and taking Zoloft. Dr. Willis also indicated that the PCF did not ask him to address whether Dustin needed custodial care (which Dr. Willis defined as 24/7/365 care), but Dr. Willis opined that Dustin did not need around-the-clock care, though he conceded that Dustin might need some indirect supervision at times.[14] Dr. Willis *961 agreed that a psychiatrist, psychologist, or social |Mworker would be better suited to address Dustin’s behavioral and anger management issues. Dr. Willis also clarified his earlier written opinion to the PCF, wherein he indicated that Dustin was not disabled and was employable, stating that he had offered that opinion from the perspective of any potential physical, rather than emotional or cognitive, limitations. Dr. Willis indicated that he was told that Dustin’s mother had not lived with him for the previous three months, so he assumed she was not providing twenty-four-hour care, but he did not know what, if any, other care she was providing to Dustin.
Based on the testimony presented, the district court rejected the PCF’s contention that it had good cause to discontinue payment for Dustin’s custodial/attendant care expenses. If factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Further, where the findings are based, on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Indeed, where the factfin-der’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Bellard v. \ American Central Ins. Co., 2007-1335 (La.4/18/08), 980 So.2d 654, 672. See also McGlothlin v. Christus St. Patrick Hospital, 2010-2775 (La.7/1/11), 65 So.3d 1218, 1231-32. Based on the district court’s factual findings in this case and the applicable law, we find no error in the award of attorney fees and costs.

Law of the Case Doctrine

Finally, the PCF asserts that the appellate court erred in its December 6, 2006 judgment, which upheld the March 8, 2006 district court judgment that had ordered the PCF to make quarterly advance payments for Dustin’s custodial/attendant care. The PCF urges this court to review the correctness of these prior lower court rulings, contending that, even if the law of the case doctrine were applicable to preclude the lower courts from changing their earlier rulings, the doctrine does not pre *962 vent this court from examining the correctness of the 2006 lower court decisions. The PCF argues that the 2006 lower court decisions eliminate its discretion to deny reimbursement of a malpractice victim’s application for the payment of expenses without first obtaining a modification of a prior judgment.
While we agree that the prior denial of supervisory review by this court (see Watkins v. Barry, 2007-0373 (La.4/27/07), 955 So.2d 686, wherein this court denied review of the appellate court’s 2006 decision) is merely a decision not to exercise supervisory jurisdiction, and it does not generally bar consideration of the issue(s) denied supervisory review (see Levine v. First National Bank of Commerce, 2006-0394 (La.12/15/06), 948 So.2d 1051, 1057), we find no need to review the 2006 lower court decisions to resolve the issues presented in this case.
In advancing its argument in this case, the PCF conflates two separate provisions of the MMA: Section 1299.43(C)’s grant of power to the PCF, as stated in Kelty v. Brumfield, 633 So.2d at 1218, to receive and evaluate a malpractice victim’s initial claim for the payment of a medical expense (after the district court lachas awarded the victim future medical expenses) and to pay, settle, or reject such a claim; and Section 1299.43(E)’s grant of power to the district court (to exercise continuing jurisdiction over the case). Contrary to the implication inherent in the PCF’s contentions (i.e., that even after a district court exercises its continuing jurisdiction and issues a ruling, judgment, or order as to a particular claim, Section 1299.43(C) continues to allow the PCF unlimited power to evaluate, pay, settle, and/or reject any subsequent such claim in any matter it deems appropriate), the matter is no longer a Section 1299.43(C) initial claim, but rather the matter falls within the purview of a district court’s Section 1299.43(E) continuing jurisdiction and is subject to the district court’s ruling, order, or judgment thereon.
CONCLUSION
We hold herein that when the PCF denies a claim for payment of a future medical or related expense and the district court thereafter exercises its continuing jurisdiction and issues a ruling as to that matter, the PCF is obligated to comply with the district court’s ruling, order, or judgment unless it modified or set aside by the court.
DECREE
AFFIRMED.
VICTORY, J., dissents in part, concurs in part and assigns reasons.
GUIDRY, J., dissents in part, concurs in part and assigns reasons.
CLARK, J., dissents in part, concurs in part with reasons.
VICTORY, J., dissents in part, concurs in part, and assigns reasons.
hi agree with much of what Justice Gui-dry says, especially the part of his dissent that reverses attorney fees and costs.
GUIDRY, Justice, dissents in part, concurs in part, and assigns reasons.
hi respectfully dissent in part from the majority’s opinion in several respects. I disagree with the majority’s determination that the trial court’s March 2006 judgment required the Patient’s Compensation Fund (hereinafter “PCF”) to seek a judicial ruling modifying the prior judgment before it could discontinue prospective payments for custodial/attendant care the PCF had good reason to believe was medically unneces *963 sary and, more pertinently, had not yet been rendered.
First, I do not believe La.Rev.Stat. 40:1299.48 authorized the remedy fashioned by the trial court in March 2006, that is, to order the PCF to make prospective payments for custodial/attendant care, to be paid in three-month increments to a special needs trust following the quarterly submission of the plaintiff caregiver’s affidavit certifying no change had occurred in the patient’s condition. While this order was arguably in response to the PCF’s failure to make timely payments for custodial/attendant care, my understanding of the statute and the jurisprudence interpreting it is that the PCF, as the fiduciary of trust funds for all recipients of future medical benefits, is required only to make payments within thirty days of the submission of a claim for medical benefits and expenses that 12have actually been incurred. See La.Rev.Stat. 40:1299.43(0 and (E)(2);[1] Hanks v. Seale, 2004-1485, p. 18 (La.6/17/05), 904 So.2d 662, 673; Hall v. Brookshire Bros., Ltd., 2002-2404, pp. 27-28 (La.6/27/03), 848 So.2d 559, 576; Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210, 1218-19. If the claim is denied, the plaintiffs remedy is to file in the district court, which retains limited continuing jurisdiction over the matter, a rule to show cause why the judgment should not be enforced. See La.Rev.Stat. 40:1299.43(E)(1); Kelty, supra.[2] The PCF, which bears the burden of proof, is then required to come forward with reasons for the denial or modification. If the court finds the PCF’s action is unreasonable, the court can award attorney fees and costs. See Bartee v. Children’s Clinic of Southwest La., 2005-583 (La.App. 3 Cir. 8/17/05), 910 So.2d 470, writ denied, 2005-2465 (La.3/24/06), 925 So.2d 1230.
Even if such a prospective remedy for custodial/attendant care is permissible under the statute, the trial court in its March 2006 judgment did not limit or delineate the PCF’s legal rights under La.Rev.Stat. 40:1299.43. The trial court in |sits order clearly recognized the PCF’s fiduciary duties and legal rights under the medical malpractice law, and did not specify the precise legal process by which the PCF could exercise those rights. The trial court in 2006 stated: “But let’s say that 30 days after the prepayment something happened to the child. Then, basically the 60 days would be reimbursed back to the [PCF]. That would be the obligation of the plaintiff. I mean, [the PCF has] legal rights all the way.” The court of appeal in *964 affirming that judgment similarly recognized the duties and rights of the PCF without specifying the manner in which those rights might be exercised.[3] The trial court’s 2012 judgment under review in this case, and which is being upheld by the majority opinion today, found that the PCF could not make the determination to cease advance payments to the special needs trust the PCF had good reason to believe were unnecessary or fraudulent without first obtaining a judicial ruling modifying the prior judgment.
But the statute does not so restrict the PCF’s duties, as we explained in Kelty:
Finally, the statutory provisions referring to the courts clearly indicate that they are not vested with original jurisdiction or decision making responsibility over future medical care claims. The courts are authorized to perform two limited functions: (i) certification of whether a malpractice victim is a patient in need, i.e., whether the victim’s damages consumed the cap limits without affording her compensation for all actual medical expenses necessitated by the malpractice, [La.Rev.Stat. 40:1299.43(A) ]; and (ii) random and ephemeral housekeeping matters, viz., the court is granted a very limited continuing jurisdiction to award attorney fees when the PCF fails to pay timely, [La.Rev.Stat 40:1299.43(E)(2) ], and order more Infrequent physical examinations of a patient, upon reasonable cause. [La.Rev.Stat. 40:1299.43(G)(5) ].
Given the minor, supporting role assigned to the courts, the expertise expected of the agency, the confidence the legislature has placed in the agency, and the active decision-making, administrative, and supervisory roles the agency is required to play, permitting courts throughout the state to conduct their own litigation involving future medical care claims would conflict with and hinder the regulatory scheme rather than supplement or promote its objectives. Indeed, the legislative scheme would be absurd and unworkable if courts were authorized to redetermine de novo reasonable, non-arbitrary decisions made by the agency with respect to the initial disposition of claims, the continuing need of patients for medical care benefits, the fiscal ability of the PCF to pay claims in full, the percentage of pro rata reduction of claim payments required to maintain the PCF’s fiscal stability, and the level of surcharges necessary to maintain the PCF’s actuarial soundness. Because all of these determinations are interrelated, the legislature clearly intended to assign the original decision-making function with respect to them to the expert administrative agency. Consequently, we conclude that the legislature intended to eliminate all judicial power in initial decision making or supervision over medical and related care claims and to vest such exclusive jurisdiction in the agency legislatively assigned to administer the PCF, subject only to court review of the agency’s actions pursuant to well established principles of judicial review.
633 So.2d at 1218-19 (emphasis supplied) (citations omitted).
*965 The majority misplaces emphasis on the “initial” claim for payment of future medical care, essentially finding the PCF, particularly for continuing care such as custodial/attendant care, can exercise its full discretionary authority only when such claims for payment are initially presented, and not thereafter if the trial court orders payment of the claim for continuing care. But by relying on this language, and the occasion of a trial court order mandating advance payments, the majority essentially creates an exception to the procedures set forth by the legislature in the statute for continuing medical care such as custodial/attendant care. There is simply no support in the statute for such an exception. As we explained in Kelty, the legislative scheme would not function efficiently “if courts were authorized to redetermine de novo reasonable, non-arbitrary decisions made by the agency with | Brespect to ... the continuing need of patients for medical care benefits,” 6B3 So.2d at 1218, and such “medical care benefits” include “reasonable ... custodial services” as the majority opinion acknowledges. See Slip op., p. 9 (citations omitted). Therefore, the medical malpractice act grants to the PCF the “exclusive jurisdiction” to determine “the continuing need” of patients for reasonable custodial care services, as part of its responsibility for “supervision over medical and related care claims,” subject only to judicial review. See Kelty, 633 So.2d at 1218-19.
Instead, there can be no dispute that the PCF here properly fulfilled its duties and exercised its rights under La.Rev.Stat. 40:1299.43. The PCF complied with the March 2006 order directing advance payments through May 2011. In May 2011, the PCF learned through the patient’s own social media postings on the internet that the patient was no longer living with his mother, who had been providing him with 24/7 eustodial/attendant care and who had submitted affidavits to the PCF asserting the patient’s custodial care requirements had not diminished. As the trial court itself found, based on the testimony of the patient’s mother, the patient was no longer living with her since May 2011, and was no longer in need of twenty-four hour custodial care. The PCF verified these facts and in June 2011 requested, pursuant to its authority under the statute, that the patient undergo an independent medical examination (“IME”) to assess his current medical and custodial care needs. The patient’s mother in August 2011 submitted the next quarterly affidavit asserting there was no change in the patient’s needs, after which the PCF, upon obtaining the results of the IME in September 2011, again declined to make advance payments for custodial/attendant care to the special needs trust. The plaintiff filed various rules and motions between September 2011 and March 2012. The issue of the patient’s need for twenty-four custodial/attendant care was |6then presented to the trial court, as stipulated by both the plaintiff and the PCF at the March 26, 2012 hearing, and resolved by the trial court, which found the patient was no longer in need of such care but was in need of only six hours a day of attendant care. At the hearing, the PCF stipulated it was not seeking reduction of the need for twenty-four hour custodial/attendant care prior to the date of the March 26, 2012 hearing, but was seeking a judicial determination only on the patient’s prospective need for custodial/attendant care. Accordingly, the trial court awarded the plaintiff with twenty-four hour custodial/attendant care from June 1, 2011, to March 26, 2012, and with six hours of custodial/attendant care thereafter.
Given this stipulation, the majority properly affirms the award for twenty-four hour custodial/attendant care until March *966 26, 2012. However, I believe the majority errs in affirming the trial court’s award of attorney fees and costs. Although one could make the argument that the PCF effectively stipulated to the fact of its failure to make payments timely, given that it stipulated that it was not contesting the payments due the plaintiff for custodial/attendant care prior to March 26, 2012, the majority’s rationale for awarding attorney fees and costs is that the PCF should have obtained a modification of the March 2006 judgment prior to discontinuing the advance payments in June and September of 2011. I do not agree with the majority’s determination that the March 2006 order implicitly limited the PCF’s legal rights under the medical malpractice act.

. Twenty-six items of future medical care and related benefits were specified in the December 8, 2003 district court judgment, covering various items of medical care, medications, physical therapy, psychiatric and psychological assessment and treatment, family counseling, case management services, and educational, vocational, and occupational related expenses. The items related to future custodial/attendant care were listed in the signed judgment as follows:

. Dr. Barry was found to be one hundred percent at fault in causing Dustin's injuries, and the other named defendant, Lake Charles Memorial Hospital, was dismissed. However, the judgment signed on December 8, 2003 stated that Dr. Barry "shall not be personally liable for an amount in excess of $100,000 plus interest thereon accruing after April 1, 1991, in accordance with the provisions of LSA-R.S. 40:1299.42B(2).” The district court also noted in its judgment that "[t]he balance of all additional amounts awarded pursuant to this judgment shall be paid on behalf of the defendant from the Louisiana Patient’s Compensation Fund.”

. Ms. Watkins' affidavits stated that she is Dustin’s mother and that "[h]e is still alive and his disabilities and care requirements have not diminished since the trial of this matter.”

. Ms. Watkins alleged in her September 19, 2011 district court rule that when she inquired about the June 2011 advance payment, which had not been received, a PCF representative advised that the check had been mailed. *949 and reviewed. In connection with the oral argument before this court, counsel for the PCF has conceded that payment of custodial/attendant care expenses was never resumed because Ms. Watkins "did not submit the requisite affidavit and certification to the PCF for payment.”

. Although Ms. Watkins answered the PCF’s appeal to the appellate court, asserting the district court erred in reducing Dustin’s custodial/attendant care from twenty-four hours per day to six hours per day, she has not sought review of the issue in this court.

. In Hanks v. Seale, this court granted certio-rari primarily to consider whether the PCF has the right to appeal a finding of liability on the part of a defendant/physician, when the defendant/physician elected to forgo an appeal and paid the $100,000.00 limit of liability; this court held that the PCF’s interest and therefore its right of appeal extended only to the issue of excess damages. See Hanks v. Seale, 904 So.2d at 665-66. In Hall v. Brook-shire Brothers, questions raised on review included how a reduction for comparative fault to a damage award was to be applied 'and when judicial interest began to run on future medical expenses; this court ruled that: (1) the total damage award recoverable against the PCF should be reduced (by the comparative fault of a non-PCF-qualified third party tortfeasor and by the victim's fault) prior to application of the MMA liability cap, and (2) judicial interest on an award of future medical expenses begins to run from the date of the filing of the complaint or the date the expenses were incurred, whichever is later. See Hall v. Brookshire Brothers, 848 So,2d at *954 576. Kelty v. Brumfield dealt with the extent to which a medical malpractice victim, whose claim for damages was filed prior to the stated applicability date (September 1, 1984) of 1984 La. Acts, No. 435’s extension of MMA coverage to future medical care and related benefits (LSA-R.S. 40:1299.43, as originally enacted by Act Number 435, provided: “The provisions of this Subsection shall be applicable to all malpractice claims filed on or after September 1, 1984.”), could bring a claim for future medical care and the extent to which earlier trial court denial(s) of the victim’s right to bring such a claim could be re-litigated, following this court’s decision in 'Williams v. Kushner, 549 So.2d 294 (La. 1989) (declaring unconstitutional and reforming Section 3 of Act 435 to make LSA-R.S. 40:1299.43 applicable to claims and litigation pending when it was passed). See Kelty v. Brumfield, 633 So.2d at 1212. In Bartee v. Children's Clinic of Southwest Louisiana, the appellate court rejected the PCF's contention that a malpractice victim could not bring a rule to show cause in the district court, seeking review of the PCF's denial of the payment of custodial care expenses, absent the victim’s prior compliance with an administrative review requirement, established by the PCF under its rulemaking authority; the appellate court held that the PCF's administrative rules could not supersede the legislature’s grant, in LSA-R.S. 40:1299.43, of continuing jurisdiction in the district court. See Bartee v. Children's Clinic of Southwest Louisiana, 910 So.2d at 471-77.

. The rationale underlying this principle was explaihed in City of Lake Charles v. Bell, 347 So.2d at 496-97 (citations omitted), as follows:
Inviolability of court orders is unique among governmental commands. When legislators or executive agencies State or Federal have transgressed constitutional or statutory bounds, their mandates need not be obeyed. Violators, of course, risk criminal sanctions if their predictions of illegality fail, but if the directive is invalid, it may be disregarded with impunity. It is only the orders of judicial authorities which must be tested in the courts before deliberate transgression can be excused on an eventual determination that the order was invalid.
The criminal contempt exception requiring compliance with court orders, while invalid non-judicial directives may be disregarded, is not the product of self-protection or arrogance of judges. Rather it is born of an experience-proven recognition that this rule is essential for the system to work. Judges are charged with the final responsibility to adjudicate legal disputes. Determinations take the form of orders. The problem is unique to the judiciary because of its particular role. Disobedience to a legislative pronouncement in no way interferes with the legislature's ability to pass laws. The dispute is simply pursued in the judiciary, and the legislature is free to discharge its responsibilities despite the disregard of its statutes. Law enforcement is also not brought to a standstill by failure to convict those who disregard the unconstitutional commands of policemen.
On the other hand, the deliberate refusal to obey an order of court without testing its *955 validity through established processes requires further action by the judiciary, directly affecting its ability to discharge its duties and responsibilities. While it should be sparingly used, the power of courts to punish for contempt is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the judicial process. Without this authority courts would be mere boards of arbitration whose orders, ruling[s], judgments and decrees would be only advisory....

. Articles 2503 and 2504 provide:
Art. 2503. Distringas, execution and revocation
In the execution of the writ of distringas, the sheriff shall seize the property of the defendant and retain it in his possession subject to the orders of the court.
The court shall revoke the writ, and order the sheriff to release and return to the defendant all property seized thereunder, when the defendant proves that he has complied with the judgment sought to be enforced through the distringas, and has also satisfied any judgment for damages which the plaintiff may have obtained against him because of his noncompliance with the judgment first mentioned.
Perishable property seized under a writ of distringas may be sold as provided in Article 2333. The proceeds of such a sale shall be held by the sheriff subject to the orders of the court.
Art. 2504. Specific performance; court directing performance by third party
If a judgment directs a party to perform a specific act, and he fails to comply within the time specified, the court may direct the act to be done by the sheriff or some other person appointed by the court, at the cost of the disobedient party, and with the same effect as if done by the party.

. We express no opinion herein as to, and leave for another day questions related to, the obligations of the parties when a ruling, order, or judgment of the district court becomes legally unenforceable (as, for example, by valid settlement between the parties, death of the obligee(s), or reversal or modification on judicial review).

. On this point the plaintiff asserts in brief to this court: "This stipulation/judicial confession relieved all parties of the necessity of introducing evidence and withdrew the matter from dispute. No evidence was submitted regarding the custodial care rendered between May/June 2011 and the date of the hearing.”

. The only district court filings made by the PCF after the instant dispute arose are two motions for extensions of time to file a response, filed in March and April of 2012, and three memoranda of law opposing the plaintiff’s rules, filed in March, April, and May of

. See LSA-C.C.P. arts. 856 (requiring "the circumstances constituting fraud or mistake shall be alleged with particularity”) and 1005 (requiring an "answer” to "set forth affirmatively ... fraud ...").

. A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. LSA-C.C. art. 1853.

. Dr. Willis’s testimony about the nature of "custodial” care highlights a lack of clarity of terms that has served to cloud the issues to some extent in this case. The 2003 original judgment awarded "custodial care” (which the judgment indicated included the services of a "nurse/attendant”) "until 2008 (when Dustin turns 18)”; the judgment also awarded "live-in support” for Dustin for twenty-four hours per day "commencing @ age 18.” When the PCF terminated payment for these costs in June 2011, Dustin was 20 years of age; therefore, the type of care that he was receiving was twenty-four hour "live-in support” rather than "custodial” care. Nevertheless, the parties and the courts have continued to refer to this "support” variously as “custodial care” and/or "custodial/attendant care.” As exemplified by Dr. Willis's testimony "custodial” care may be generally thought of as of a more extensive type of care ("24/7/365”), as when Ms. Watkins had parental "custody” of Dustin as a minor, while the concept of live-in "support” is more assis-tive in nature. (See Merriam-Webster Online Dictionary, http://www.merriam-webster.com/ dictionaiy/support, defining "support” as to "assist, help.”) The Watkins I appellate court *961 opinion, discussing the original 2003 trial testimony, illustrates the type of future care that was anticipated for Dustin, as being supportive or assistive, rather than entirely custodial:
As a result of the injury to the brain sustained during the stroke, Dustin has suffered seizures and has demonstrated cognitive function that was described as mentally retarded. In school, he functions well below his grade level and is in remedial classes throughout the day. Furthermore, a number of witnesses testified to his behavioral difficulties, which included periods of both verbal and physical aggression. Dr. Roseman opined that Dustin will need constant supervision throughout his life to diminish the possibility of injury to either Dustin or others. See Watkins I, 896 So.2d at 137-38. Thus, the PCF’s emphasis on Dustin's lack of a current physical impairment, rendering twenty-four hour "custodial” care unnecessary, overlooks the reality recognized by the district court-that Dustin continues to need supportive/assistive care in some situations involving mental functioning. We further note that the 2012 judgment, under consideration herein, labeled this care as "custodial/attendant,” and this designation was also used, for the most part, by the appellate court (see Watkins III, 114 So.3d at 505-06); therefore, for ease of discussion, we have used this language herein.

. The PCF's obligation to pay future medical expenses is set forth in La.Rev.Stat. 40:1299.43(0:
■ Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court’s finding or a settlement is reached between a patient and the patient's compensation fund in which the provision of medical care and related benefits that will be incurred after the date of settlement is agreed upon and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patient’s compensation fund through the board for all future medical care and related benefits directly or indirectly made necessary by the health care provider’s malpractice unless the patient refuses to allow them to be furnished.
La.Rev.Stat. 40:1299.43(E)(2) provides:
E. (2) The court shall award reasonable attorney fees to the claimant’s attorney if the court finds that the patient’s compensation fund unreasonably fails to pay for medical care within thirty days after submission of a claim for payment of such benefits.

. La.Rev.Stat. 40:1299.43(E)(1) provides:
E. (1) The district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient.

. The court of appeal stated:
Nevertheless, the PCF is not without recourse in the event that abuse occurs or is suspected. Section 1299.43(E)(1) provides that "the district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient.” Section 1299.43(G) allows the PCF to require the plaintiff to submit to periodic examinations by the physician of its choice. Watkins v. Barry, 2006-858, pp. 4-5 (La.App. 3 Cir. 12/6/06), 946 So.2d 262, 265, writ denied, 2007-0373 (La.4/27/07), 955 So.2d 686.